Mary Ann PHILLIPS, Plaintiff-Appellee,

v.

John O. MARSH, Jr., et al., Defendants-Appellants.

No. 1148, Docket 82-6045.

United States Court of Appeals, Second Circuit.

Argued April 23, 1982.

Decided Aug. 18, 1982.

Jane E. Booth, Asst. U. S. Atty., New York City (John S. Martin, Jr., U. S. Atty. for the S. D. New York, Richard N. Papper, Steven E. Obus, Asst. U. S. Attys., New York City, of counsel), for defendants-appellants.

Steven J. Hyman, Hyman & Miner, New York City (Mary C. Tucker, Brooklyn, N. Y., of counsel), for plaintiff-appellee.

Before OAKES, CARDAMONE and WINTER, Circuit Judges.

OAKES, Circuit Judge:

This is an appeal from an order of the United States District Court for the Southern District of New York, Robert J. Ward, Judge, which granted plaintiff Mary Ann Phillips' motion for a preliminary injunction ordering her reinstated as a cadet at the United States Military Academy at West Point (Academy) pending the outcome of her lawsuit against the defendants-appellants. The preliminary injunction, as apparently subsequently interpreted by Judge Ward, also required the Academy to award Phillips a degree and commission her as an officer in the United States Army.

Phillips was expelled from the Academy on January 18, 1982 following her third award of 25 or more demerits under the Cadet Disciplinary System. The last demerit award stemmed from events occurring on the evening of July 21, 1981, when Phillips was found unconscious in a car that had been in an accident. While being treated in a hospital she admitted to two military policemen that she had been drinking at a tavern within 20 kilometers of the Academy, conduct which is prohibited by an Academy regulation. Plaintiff-appellee claims that this statement was taken from her when she was inebriated and injured and had expressed a desire not to answer questions. She brought suit against the defendants asserting that the statement was elicited in violation of her right against self-incrimination and was improperly relied upon in the proceedings which culminated in her separation from the Academy.

Since she was in her final semester at the Academy when notified of her dismissal, Phillips applied for a preliminary injunction to enable her to complete her schoolwork while her case was being prepared for trial. Judge Ward held an evidentiary hearing and, finding that the standards for issuing a preliminary injunction had been met, ordered Phillips reinstated. While this order was before us on appeal plaintiff completed her courses. She returned to the district

court which, at her request, made comments in open court indicating that its interpretation of its original injunction included the requirement that the Academy permit her to graduate and award her a diploma. On motion of the Government we stayed the subsequent order, thereby holding the issue of Phillips' graduation in abeyance pending resolution of this appeal.

■ This appeal did not come before us until April 23, 1982, approximately one month before Phillips was to complete her last exams. During the time required to determine the issues involved and prepare to draft an expression of our views, plaintiff's final semester has ended. The question whether she should be permitted to complete the semester is therefore moot, since there is no actual controversy on this issue extant at this stage of review, *see Preiser v. Newkirk*, 422 U.S. 395, 401, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1975). The preliminary injunction is now before us only to the extent that it requires the Academy to graduate Phillips and award her a diploma, an interpretation of the injunction with which we do not necessarily agree.

■ The grant of a preliminary injunction requires a showing of irreparable harm and either a likelihood of success on the merits or sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the moving party. *Jack Kahn Music Co. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 758 (2d Cir. 1979). We do not now determine the likelihood of plaintiff's success on the merits or the seriousness of the questions going to the merits, for we find that Phillips has not made the necessary threshold showing of irreparable harm.

It may well have been true, as Judge Ward concluded, that interruption of Phillips's academic work would have created irreparable harm, because "[t]he loss of time, military seniority, education and status involved in a dismissal from the Academy cannot be adequately compensated at law." *See Doe v. New York University*, 666 F.2d 761 at 773 (2d Cir. 1981). But this does not equally hold true with respect to a delay in Phillips's graduation. We can conceive of no irreparable harm that would accrue to her in allowing her graduation to await the outcome of the trial on the merits; any damages to her from deferring her career as a military officer in that period of time would surely be compensable by monetary damages. *See Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70 (2d Cir. 1979).

We therefore reverse the grant of the preliminary injunction insofar as it required the Academy to graduate and commission Phillips. We express no view with respect to the remainder of the preliminary injunction, which is now unreviewable because of mootness. We urge the court below to continue its efforts to bring this case to trial and final judgment as expeditiously as possible.

RALPH K. WINTER, Circuit Judge (concurring in the result):

At issue is the propriety of preliminary injunctive relief reinstating a cadet in her class during what would have been her final semester, compelling the Academy to award a degree and ordering the President to commission the cadet a Second Lieutenant in the United States Army. While I agree with the result reached by the majority, I do so on different grounds.

I

Few facts are in dispute and much of the evidence is documentary. Cadet Mary Ann Phillips went with some friends to Tom's Tavern in Cornwall, New York, on the evening of July 21, 1981. Tom's Tavern is within 20 kilometers of the military academy and the consumption of alcohol within that radius is prohibited by an Academy regulation. While at the Tavern, Phillips violated that regulation repeatedly and in a variety of ways. She was later found in the passenger seat of her wrecked car, which had crashed into a retaining wall on a New York highway. Attending medical personnel were convinced that Phillips had been only a passenger. Since the condition

of the windshield apparently raised concern that the driver might have been seriously injured, arriving military personnel patrolled the woods in search of the driver. As part of that search, two MP's went to the hospital to question Phillips. While there is some dispute as to when certain matters were discussed and a formal statement taken, all agree that Phillips at some point told the MP's that she would prefer not to make a statement. After consultation with their superiors, the MP's told Phillips that her statement was needed as a witness.

Phillips then gave a statement which mentioned that she had been drinking at Tom's Tavern. Most of the statement, however, had to do with a Sergeant Chapelle of the 82nd Airborne Division, whom Phillips identified as the driver. The MPs' written reports of the interview in fact do not mention Tom's Tavern but focus entirely upon the statement that someone else was driving the car. After talking with Chapelle on the phone the next morning, Phillips called the MP in charge of the investigation, a Sergeant Boles, and said she wanted to change her statement. Boles went to see Phillips, read her her rights and took her statement. Again she mentioned Tom's Tavern but now denied that Chapelle had been the driver, saying she had been alone in the car.

At this point Phillips was in serious trouble. She had previously committed two major breaches of Academy regulations involving alcohol. She now faced yet a third such charge, which alone might lead to separation from the Academy. Even more ominously, she faced an Honor Code proceeding for deliberate lying. Phillips, accompanied by her uncle, Brigadier General O'Shea, who is also an attorney, spoke with a Captain Godek of the Provost Marshal's Office about her plight. Godek then sent a memorandum to the Honor Code Board that Phillips' first statement had been given against her will when she was intoxicated and in a state of shock. He said she was not "responsible" for it and that subsequent interviews reflected "the true events" and contained "no inconsistencies." He recom-

mended that the statement not be used against her "for any purpose." The Honor Code Board agreed that in view of the circumstances in which the first statement was given, the charge of deliberate lying should be dismissed.

Meanwhile, a delinquency report alleging a violation of the 20 kilometer rule compounded by driving while under the influence was filed against Phillips. She responded with a written explanation which stated:

> Concerning [the offense of drinking in a prohibited area], It [sic] is correct. Tom's Tavern is a well known establishment routinely frequented by cadets. I point this out, not to argue with the fact that an offense took place, but simply as information to anyone who is assessing my offense as being indicative of unusual tendencies toward alcohol. I do, however, fully acknowledge that I was drinking in a prohibited area. It seems fair to point out that the only basis for concluding that I was drinking off limits was my own answers to questions that were put to me by two MP's.

Phillips received a disciplinary award of more than 25 demerits, which, when added to the demerits for previous offenses, made her subject to separation from the Academy. A proceeding known as a Conduct Investigation was then undertaken. Phillips was notified in writing of her rights, including written notice of any charges, time to prepare a defense, and the assistance of counsel. She also was accorded the right to attend the hearing, to testify or remain silent, to examine all records and documents to be considered in the investigation, to object to evidence, to challenge any of the demerits awarded, to call witnesses, to question and examine witnesses, and to present evidence in support of any challenge to the demerits. She was given a form to fill out indicating her decisions as to these rights. She asked to appear but waived the right to counsel. She stated she intended to challenge none of the demerits, including those awarded for drinking at

Tom's Tavern. She listed 11 individuals whom she wanted to give information on her performance as a cadet.

The report of the Conduct Investigation states that Phillips orally swore that her rights had been observed. She stated that she had had the opportunity to examine the documents (which included her original statement) and that she did not object to any of them. She also waived any challenge to the actions of the disciplinary boards or the awards of demerits. Phillips confirmed this in her testimony at the injunction hearing.

On October 9, 1981, the Commandant of Cadets recommended her separation from the Academy. Phillips wrote the Superintendent of the Academy and requested that she be suspended for a year. On November 4, 1981, the Superintendent recommended her separation. The matter then went to the Secretary of the Army. On November 13, 1981, General O'Shea wrote the Secretary and argued that the presence of Phillips' first statement in her administrative record was a constitutional barrier to her separation from the Academy. Ten days later, a letter from an attorney retained by Phillips raised the matter in even more detail, arguing that no disciplinary action whatsoever could be taken against her since all evidence flowed from her original statement. The Secretary of the Army then ordered her separation on January 18, 1982.

This action was brought and Judge Ward issued his injunction in February. Conceding the lack of precedent for applying the Fifth Amendment's exclusionary rule to administrative proceedings, he nevertheless held that this raised a fair ground for litigation and that the balance of hardship tipped decidedly in the favor of the plaintiff. He did not address the claim that Phillips had waived this issue in the Conduct Investigation.

This appeal followed and was heard by us on April 23, 1982. The problem of the upcoming graduation at West Point was discussed at length at oral argument. On May 24, 1982, two days before graduation at West Point, we had not reached a deci-

sion and the government moved for a stay in the District Court interpreting the injunction not to require the awarding of a degree to Phillips. Judge Ward heard argument and indicated orally that he believed Phillips was entitled to be graduated and, apparently, to be commissioned as a Second Lieutenant. He indicated his exasperation with the Academy for the delay between the incident and Phillips' separation and with us for having failed to act on the appeal. He declined to rule, however, but instead scheduled a hearing for 4:30 p. m. on May 25, 1982, at which time he said he would announce his decision. The government objected that if it waited for his ruling and he ruled adversely, it would not have an opportunity to secure a stay from us before graduation at the Academy. Judge Ward was unimpressed. The next day, the government moved for a stay from us, which we granted.

II

The majority concludes that while suspension as a cadet might cause Phillips irreparable harm, denial of a degree and a Commission would not. I cannot agree. The irreparable harm to Phillips is not her loss of instruction time but the interruption of her career as a professional military officer. There are no lack of colleges or universities which she might attend if all that is at stake is loss of instruction time. There is no reason to attend West Point apart from pursuit of a military career. The irreparable harm, if any, is thus in the career interruption, not in the loss of instruction time. Phillips is now only marginally better off than she would have been had Judge Ward not reinstated her in her class six weeks into her final semester. She is now in a state of limbo, losing career experience and military seniority. At best, she has gained a couple of months of instruction at the Academy, for all else remains the same.

It does not follow, however, that Phillips was entitled to any preliminary relief. While *Hagopian v. Knowlton*, 470 F.2d 201 (2d Cir. 1972) appears to have held that suspension or dismissal from West Point constitutes sufficient irreparable harm to justify preliminary relief, that case has, I

believe, been overruled by *Sampson v. Murray*, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974). In *Sampson*, the Supreme Court forbade granting the preliminary relief of reinstatement to a civilian employee of the government upon a showing of interruption of career and damage to reputation. Even more stringent standards would, I assume, govern the use of such relief where the military is involved. Were it necessary, I would hold that *Hagopian* has been overruled. However, it is not necessary, for Phillips has shown neither a probability of success on the merits nor a fair ground for litigation.

### III

Since Phillips violated a number of regulations other than the 20 kilometer rule, and the evidence of those violations is ubiquitous, she relied on an extreme variant of the fruit of the poisonous tree theory, namely, that the questioning by the MP's at the hospital taints any and all attempts to discipline her for the events of July 21. Only thus can she avoid a new hearing on another charge. There is, however, no authority whatsoever to support her extreme position. Quite the contrary, for the Fifth Amendment does not forbid the compelling of testimony which may subsequently be used against the witness in administrative proceedings such as the Conduct Investigation. *In re Daley*, 549 F.2d 469 (7th Cir.) *cert. denied*, 434 U.S. 829, 98 S.Ct. 110, 54 L.Ed.2d 89 (1977) (disbarment of attorney); *Childs v. McCord*, 556 F.2d 1178 (4th Cir. 1977) (licensing of professional engineer). Phillips thus cannot show a violation of her constitutional rights even as to use of the challenged statement in the Conduct Investigation, much less establish an absolute bar to any and all discipline for the events of July 21. In addition, the relevant regulation of the Academy forbids use of an involuntary admission against a cadet only when the coercion is "likely to affect its truthful-

ness," U.S.C.C. Reg. 351–1, Annex D, Part I, § 3(c)(4), at D–79, a condition plainly not met in Phillips' case at least as to the portion of the statement relating to Tom's Tavern.

Moreover, Phillips never brought to the attention of the Conduct Investigation the point she now raises with such fervor before us. To the contrary, she repeatedly admitted drinking in Tom's Tavern and in fact emphasized that she had herself candidly told the MP's where she had been. She explicitly declined to challenge the issuance of demerits. By failing to do so, Phillips in effect told the Conduct Investigation that it need not find facts as to whether she had been drinking in Tom's Tavern. This was not out of ignorance. Phillips was fully aware of the circumstances surrounding her statements to the MP and had used them in order to deflect the Honor Code charge.[1] She quite obviously knew how to raise that point and quite as obviously decided not to do so in the case of the Conduct Investigation. Thus, her acknowledgement of the 20 kilometer violation was contemporaneous with her defense to the Honor Code proceeding. General O'Shea's letter to the Secretary of the Army in November is the first hint of a claim by Phillips that the demerits were based on illegal evidence.

Whether we call it a waiver or a failure to exhaust remedies matters not, for it amounts to the same thing. Had she objected to the use of her statement, the Academy might either have cured the alleged violation by independent evidence (which was ample) or altered the charge to one of several others (also ample). Instead, it took her at her word that there was no factual, legal or constitutional issue involved. Even if Phillips had the rights she now asserts, granting injunctive relief in such circumstances would allow her to assume a posture of repentance and candor in

---

1. Phillips relies upon Captain Godek's memorandum advising that her first statement should not be used "for any purpose." However, that statement plainly addressed only the charge of deliberate lying as to the role of Sergeant Chapelle. Thus, it also states, "All interviews conducted after the evening of the accident appear to portray the true events . . . and . . . reveal no inconsistencies." Since those interviews also mention Tom's Tavern, Godek clearly was concerned only with the Honor Code charge. In any event, if Phillips believed Godek meant otherwise, she had only to raise the issue.

disciplinary proceedings in the hope of leniency while preserving the right to attack those proceedings before a federal judge on previously unnoticed grounds. To say that cadets are entitled to due process is not to require a combing of each record to locate possible error without regard to actual prejudice to the cadet or whether the claim was ever raised at the Academy level.[2]

The majority does Phillips no great favor in avoiding the issue of probability of success. Most of the trial record in this case will consist of Phillips' testimony and documents now before us and, as in *Hagopian*, there is nothing premature in ruling on that probability in reviewing a preliminary injunction. The majority can urge expedition by the District Judge—who will understandably perceive no little irony in such instructions from us—but the present delay in going to trial may well stem from a desire to avoid further expense in what may be doomed, and certainly will be protracted, litigation.

I concur, therefore, in the reversal of Judge Ward's order.

See also, 2 Cir., 635 F.2d 67.

---

**2.** Judge Ward's reaction as to the delay between the incident of July 21, 1981 and the final order of separation of January 18, 1982 is understandable. On the other hand, the Academy's affording of a variety of rights followed by several appeals accounts for the time involved. The record indicates that no undue delay at any stage was involved. The most noticeable period of delay involves the appeal to the Secretary of the Army in which General O'Shea raised for the first time the argument that the awarding of demerits was illegal.